IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID BOYER PRINCE,<br><br>Defendant. | No. C 10-00153 CRB<br><br>**ORDER DENYING MOTION FOR NEW TRIAL** |

Defendant David Prince timely filed a Motion for a New Trial following his conviction of five charges of wire fraud. See generally Mot. (dkt. 246). The Motion asserts that the Court made three errors, each of which warrant a new trial under Federal Rule of Criminal Procedure 33. See Mot. at 2. The alleged errors consist of (1) failure to give two of the Defendant's proposed instructions, (2) not requiring Dr. Lance Lee to assert his Fifth Amendment privilege in front of the jury, and (3) improperly prohibiting the Defendant from cross-examining the government's financial expert regarding facts underlying his analysis and conclusions. Id. As discussed below, the Court concludes that none of these three constitute error, and that Defendant has therefore not demonstrated that "it is reasonably likely that the outcome of the trial would have been different absent the alleged error." See United States v. Butler, 567 F.2d 885, 891 (9th Cir. 1978). Accordingly, the Motion is DENIED.

## I. BACKGROUND

In early 2010, a grand jury returned an indictment against the Defendant, charging him with twelve counts of wire fraud in violation of 18 U.S.C. § 1343. See generally Indictment (dkt. 1). It claimed that between August 2005 and January 2007, the Defendant and others devised a scheme to defraud investors to invest in the Leopard Fund, Dawnstar Alliance, and MJE Invest! by making false promises and representations to the investors about "the nature and track record of his investment entities, the safety and security of their investments, the rate of return investors would receive, his compliance with Securities and Exchange Commission (SEC) regulations, and the manner in which their investments would be handled." Id. ¶ 6. The government alleged, and the evidence at trial demonstrated, that among other misrepresentations, the Defendant (1) promised investors that their principal was "guaranteed," although that guarantee was essentially meaningless, and (2) promised investors that their investment would be "put to trade," although in some cases it never was. See Opp'n at 2. The Defendant converted some of his investors' $1.2 million for his own personal use, and lost much of the rest in risky investments. Id.; Indictment ¶ 7.

Trial began on September 19, 2011, and the jury reached a verdict on October 5, 2011. See Trial Log (dkt. 245). The jury found the Defendant guilty of Counts 3 through 7. See Verdict Form (dkt. 241). The Defendant now moves for a new trial. See Mot. (dkt. 246).

## II. LEGAL STANDARD

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A party bringing such a motion must show that there is a reasonable probability that a miscarriage of justice resulted from the error. See Harper v. United States, 296 F.2d 612, 614 (9th Cir. 1962). To meet this burden, a party must show that it is reasonably likely that the outcome of the trial would have been different absent the alleged error. Butler, 567 F.2d at 891; United States v. Logan, 861 F.2d 859, 864 (5th Cir. 1988).

2

**III. DISCUSSION**

Defendant argues that the Court made three errors that warrant a new trial: (1) the Court failed to give two of the Defendant's proposed instructions; (2) the Court did not require Dr. Lee to assert his Fifth Amendment privilege in front of the jury; and (3) the Court improperly prohibited the Defendant from cross-examining the government's financial expert about the facts underlying his analysis and conclusions. Mot. at 2. This Order will address each alleged error in turn.

**A.    Failure to Give Defendant's Proposed Jury Instructions**

Defendant first argues that the Court erred by refusing to give his proposed Missing Witness and "Guaranteed" and "Secured" instructions. See Mot. at 3-10. In assessing a defendant's argument that omitted jury instructions entitle him to a new trial, the legal standard is whether the jury instructions as a whole were misleading or inadequate to guide the jury's deliberations. United States v. Joetzki, 952 F.2d 1090, 1095-96 (9th Cir. 1991). To be entitled to a new trial based on the district court's refusal to instruct on a defense theory, a defendant must prevail on a three-prong test. United States v. Thomas, 612 F.3d 1107, 1120 (9th Cir. 2010). That test consists of: (1) whether the theory underlying the jury instruction has "some foundation in evidence;" (2) whether the theory is "supported by law;" and (3) whether "other instructions . . . adequately cover [the] defense theory." Id. (internal citations omitted).

**1.    Missing Witness Instructions**

//
//
//
//
//
//
//
//

3

1   The Defendant proposed two alternative Missing Witness Instructions.[1] The
2 instructions both explain that Dr. Lee did not testify and that the defense contends that the
3 government was in the best position to call him. See dkt. 206 at 7-8. Both suggest that the
4 jury might infer that Dr. Lee would have testified unfavorably to the government. Id. The
5 first instruction also includes some explanation of immunity ("The government had the
6 opportunity to grant immunity to Dr. Lee, but chose not to. Had the government granted Dr.
7 Lee immunity, Dr. Lee could not have refused to testify.").[2] Id. at 7. The Defendant argues
8 that the instructions were important because they would have clarified for the jury why Dr.
9 Lee did not testify, and prevented the jury from holding the Defendant responsible for Dr.
10 Lee's absence. Mot. at 5-6.

---

[1] Defense's Proposed Jury Instruction 4-a (dkt. 206) reads:

You have heard testimony about Dr. Loren Daniel Lee (also called Lance Lee). The government did not call Dr. Lee to testify. The defense attempted to call Dr. Lee to testify in this case, but Dr. Lee refused, stating under oath that his testimony might incriminate him. The government had the opportunity to grant immunity to Dr. Lee, but chose not to. Had the government granted Dr. Lee immunity, Dr. Lee could not have refused to testify. The defense does not have the ability to grant immunity, only the government does.
   The defense has argued that Dr. Lee could have given material testimony in this case and that the government was in the best position to produce this witness. If you find that Dr. Lee could have been called by the government and would have given important new testimony, and that the government was in the best position to call Dr. Lee, but failed to do so, you are permitted, but you are not required, to infer that the testimony of Dr. Lee would have been unfavorable to the government.
   In deciding whether to draw an inference that Dr. Lee would have testified unfavorably to the government, you may consider whether Dr. Lee's testimony would have merely repeated other testimony and evidence already before you.

Defense's Proposed Jury Instruction 4-b (dkt. 206) reads:

You have heard testimony about Dr. Loren Daniel Lee (also called Lance Lee. Dr. Lee was not called to testify. The defense has argued that Dr. Lee could have given material testimony in this case and that the government was in the best position to produce this witness.
   If you find that Dr. Lee could have been called by the government and would have given important testimony, and that the government was in the best position to call Dr. Lee, but failed to do so, you are permitted, but you are not required, to infer that the testimony of Dr. Lee would have been unfavorable to the government.
   In deciding whether to draw an inference that Dr. Lee would have testified unfavorably to the government, you may consider whether Dr. Lee would have merely repeated other testimony and evidence already before you.

[2] The Court will not now revisit the question of whether the government should have been compelled to grant Dr. Lee immunity, as this is not a basis for the Defendant's Motion.

4

Whether to give a missing witness instruction is within the discretion of the Court. See United States v. Bautista, 509 F.2d 675, 678 (9th Cir. 1975); Comment to the Ninth Circuit Missing Witness Pattern Instruction (4.13) ("The Court has the discretion to give the missing witness instruction or to leave the matter to the argument of counsel").  "A missing witness instruction is proper only if from all the circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one." United States v. Bramble, 680 F.2d 590, 592 (9th Cir. 1982) (internal quotation marks omitted).  One way to establish an inference that an absent witness's testimony would be unfavorable is if it is "peculiarly within the power of . . . the prosecution . . . to produce a witness who could give material testimony on an issue." See id.

The Defendant concedes that "a witness's unavailability due to his assertion of a Fifth Amendment right has been ruled by some courts to make a witness unavailable to both parties and therefore not within the peculiar power of the government." Mot. at 6 (citing United States v. Brutzman, 731 F.2d 1449 (9th Cir. 1984), overruled on other grounds by United States v. Charmley, 764 F.2d 675, 677 n.1 (9th Cir. 1985)).  The Defendant seeks to distinguish Brutzman, however, arguing that "the government's ability to immunize witnesses – a power which the defense does not possess – clearly gave the government the exclusive power to call Dr. Lee." Mot. at 6.  But the government's ability to immunize witnesses was known to the court in Brutzman.  See id. ("Arnett was not peculiarly within the power of the government. He invoked his privilege against self-incrimination, and the government chose not to seek use immunity to obtain that testimony.").  Also, the court in Brutzman, 731 F.2d at 1453-54, is not just "some courts," see Mot. at 6, but the Ninth Circuit.  Other cases within the Circuit have followed suit.  See, e.g., United States v. Harwood, 189 Fed. Appx. 661, 663 (9th Cir. 2006) ("Here, as in Brutzman, the unavailability resulted from an invocation of the privilege against self-incrimination.  Therefore, the witness was unavailable to both parties, and the court's refusal to give an absent witness instruction was proper."); United States v. Ravandi, 261 Fed. Appx. 46, 49 (9th Cir. 2007)

5

1 (same); United States v. Hakimian, No. CR-09-0021 DLJ, 2010 WL 2673407, at *7 (N.D.
2 Cal. Jul. 1, 2010) (same). The Defendant has pointed to no authority holding to the contrary.
3      Nor has the Defendant otherwise demonstrated that Dr. Lee's testimony would have
4 been unfavorable to the government. In light of the extensive testimony that the Defendant
5 took an active role in managing the funds, that he was the sole signatory on the Ameritrade
6 accounts, and that he received all of the account statements, it seems at least equally
7 plausible that Dr. Lee would have sought to minimize his role in the scheme and to shift
8 blame to the Defendant. Moreover, the government might have decided not to call Dr. Lee,
9 not because his testimony would have been unfavorable, but because the government did not
10 think it needed his testimony to get a conviction. Or because doing so required granting him
11 immunity and, for any number of reasons – including its belief that he was also culpable for
12 the crimes – it did not wish to give Dr. Lee immunity. Therefore, even if the Missing
13 Witness instructions had some foundation in the evidence, they were not supported by the
14 law. See Thomas, 612 F.3d at 1120.
15      In addition, the Missing Witness instructions were not necessary because "other
16 instructions . . . adequately cover [the] defense theory." Id. Over the government's
17 objection, the Court permitted an instruction on the theory that the Defendant lacked the
18 intent to defraud because he was acting in good faith in reliance on what Dr. Lee told him.
19 See Jury Instructions (dkt. 232) at 20 ("Good Faith Defense").[3] The Court hastens to add that
20 it rejects Defendant's argument at the motion hearing that Dr. Lee could really have
21 established the Defendant's good faith. The evidence that came in at trial was absolutely

---

[3] That instruction reads:

Good faith is a complete defense to the charges of wire fraud. A defendant is not required to prove good faith. The Government must prove intent to defraud beyond a reasonable doubt.

An honestly held opinion or an honestly formed belief cannot provide fraudulent intent – even if the opinion or belief is mistaken.

Nevertheless, if you find that the Defendant acted with reckless disregard for the truth of a material misrepresentation, such a finding is inconsistent with good faith. Thus, an honest belief that a business venture would ultimately succeed does not constitute good faith if the Defendant intended to deceive investors by making material representations that the Defendant knew to be false or fraudulent, or if the Defendant acted with reckless disregard for the truth of a material misrepresentation. Id.

1  devastating to Defendant's claim of good faith. The jury could have found that the
2  Defendant lacked good faith <u>even if</u> it believed that Dr. Lee said everything to the Defendant
3  that the Defendant claimed Dr. Lee said. Even if the Defendant's initial introduction to the
4  trader was by Dr. Lee, and even if it was an excessively glowing introduction, the jury could
5  reasonably have found that there was no way the Defendant believed the subsequent
6  representations he made to the victims, about the trader and also about the health of the
7  funds, in light of his law degree and practice, his own contacts with the trader, his experience
8  trading his own money, his regular review of the Ameritrade account statements, and <u>the fact</u>
9  <u>that many of the representations were made at a time when no one could look at the balances</u>
10 <u>of the funds and believe that there were sufficient funds to the victims'</u> .

11  Accordingly, the Court concludes that its refusal to give Defendant's proposed
12 Missing Witness instructions was not error.

### 2. "Guaranteed" and "Secured" Instruction

14 The Defendant also proposed an Instruction defining and distinguishing the terms
15 "guaranteed" and "secured."[4] The Defendant argues that courts are to "instruct the jury
16 regarding the meaning of terms outside the common understanding of a juror, or terms that
17 are so ambiguous or technical as to require a specific definition." <u>See</u> Mot. (citing <u>United</u>
18 <u>States v. Young</u>, 458 F.3d 998, 1010 (9th Cir. 2006)). And he asserts that "the meaning of
19 these highly technical terms and the differences between them are not something within the
20 juror's common knowledge, and therefore an instruction as to their particular meanings was

---

[4] Defense Proposed Jury Instruction 11 (dkt. 206) reads:

You have heard testimony in this trial regarding a guarantee of principal. There has also been testimony regarding the concept of security or backing for a guarantee.
If a loan or principal balance is guaranteed, it is promised to be returned.
If a loan or principal balance is secured, an asset or a piece of property has been pledged or mortgaged as collateral if a borrower defaults on its obligation.
Mr. Prince is charged with misrepresenting to witnesses that their loan or principal balances to MJE Invest, Dawnstar Alliance, or The Leopard Fund were guaranteed. In considering whether this statement was made, you should consider whether Mr. Prince represented to a witness that the loan or principal was secured or guaranteed.
If you determine such a statement was made, you should then consider the differences in the meanings of these terms in deciding whether Mr. Prince made a misrepresentation that the witness's loan or principal was guaranteed.

1  required." Mot. at 10. The Court finds that those words are within the common
2  understanding of the jurors, and notes that the Defendant provided no evidence to the
3  contrary.

4  In addition, the proposed instruction is both confusing and argumentative: it instructs
5  the jurors to consider not only whether the Defendant told investors that their principal was
6  guaranteed, but also whether the statement was that the principal was either secured or
7  guaranteed, and then, the differences between the terms, in deciding whether the statement
8  was a misrepresentation. See dkt. 206 at 27. This is needlessly complicated. One of the
9  misrepresentations alleged[5] was that investors' principal was guaranteed. In considering that
10 allegation, jurors needed only determine (1) whether Defendant made that statement, and (2)
11 whether it was false. To the extent the defense wished to argue that Defendant did not make
12 that statement, and that what he really said was that principal was "secured," it could have
13 done so, but that argument had no place in the jury instructions.

14 The Court further notes that at the time the Defendant proposed the "Guaranteed" and
15 "Secured" instruction, the only support he provided was United States v. Gering, 716 F.2d
16 615, 622 (1983), which he cited for the principle that the trial court must instruct on a
17 defendant's theory of the case. See Def. Proposed Instr. (dkt. 206) at 27. But the defense's
18 theory of the case was not that there is a distinction between "guaranteed" and "secured" – it
19 was that the Defendant acted in good faith, blindly optimistic about the funds' prospects even
20 as they imploded. As already discussed, the Court permitted an instruction on that theory.
21 See Jury Instructions (dkt. 232) at 20 ("Good Faith Defense"). The Defendant therefore
22 cannot prevail under Thomas, 612 F.3d at 1120 (asking, among other things, whether "other
23 instructions . . . adequately cover [the] defense theory.").

24 Accordingly, the Court concludes that its refusal to give Defendant's proposed
25 instruction on "Guaranteed" and "Secured" was not error.
26 //
27
28  [5] The Defendant oversimplifies the case against him by stating that "the meaning of the term 'guaranteed' underlied each of the seven charges at trial." See Reply (dkt. 252) at 6.

8

### 3. Conclusion as to Instructions

The instructions as a whole were adequate, not misleading, and do not warrant a new trial.

### B. Not Requiring Dr. Lee to Invoke His Fifth Amendment Privilege in Front of the Jury

Defendant next argues that the Court erred by allowing Dr. Lee to invoke his Fifth Amendment privilege outside of the presence of the jury. See Mot. at 10-12. The Defendant concedes that "as a general matter, a non-party witness cannot be called to testify solely for the purpose of having the witness claim his Fifth Amendment privilege before the jury," Mot. at 11 (citing United States v. Licavoli, 604 F.2d 613, 624 (9th Cir. 1979)), but argues that this case is an exception to the rule.

In making this argument, Defendant relies almost entirely on United States v. Seifert, 648 F.2d 557, 560-61 (9th Cir. 1980). See Mot. at 11-12. In Seifert, 648 F.2d at 560, a non-party witness took the stand and answered all of the questions he was asked, save one about the identity of his loan shark, to which he responded: "I'd rather not say for fear of my own life." The Court then allowed the question to be put to the witness again, but not in the presence of the jury. Id. The witness again declined to name the loan shark, this time on the ground that his answer might incriminate him. Id.

On appeal, the defendant argued that the trial court erred in not requiring the witness to assert his Fifth Amendment privilege in front of the jury. Id. The Ninth Circuit reiterated its holding that "a non-party witness cannot be called solely to have him claim his privilege before the jury," id. (citing United States v. Licavoli, 604 F.2d 613, 624 (9th Cir. 1979) and United States v. Espinoza, 578 F.2d 224, 228 (9th Cir. 1978)), but added that it had not decided the question presented there. And it noted that another Ninth Circuit case, in dictum, suggested "that a non-party who testifies can be required to invoke the privilege before the jury." Id. (citing United States v. Gay, 567 F.2d 916, 920 (9th Cir. 1978)). The Ninth Circuit then concluded that the trial court should have allowed counsel to ask the question before the jury, adding that his invocation of privilege would not "be the sort of major event[] to which the jury might give undue weight, that the complete refusal of a witness to

9

testify might be." Id. at 560-61. It reasoned that the witness "had answered every other question put to him" and that "[h]is refusal to answer the one question about the identity of the lender would be a form of impeachment." Id. at 561. Nonetheless, even in Seifert, the court's error in not allowing counsel to pose the question before the jury did not warrant reversal. Id.

The facts that took Seifert outside of the general rule are not present here. Dr. Lee had not answered all questions posed to him and then suddenly refused to answer one; he refused to testify altogether. Calling Dr. Lee solely to have him take the Fifth before the jury would be precisely "the sort of major event[] to which the jury might give undue weight." See id. at 560-61. Nor would calling Dr. Lee serve the purposes of impeachment, as the Defendant concedes. See Mot. at 11. The defense argues, however, that "two other reasons" justify calling Dr. Lee before the jury: (1) calling him before the jury "would confirm the existence of Dr. Lee, thereby corroborating, at least in that limited respect, Mr. Prince's testimony that all his information regarding the trader(s) and the trading history was provided to him by Dr. Lee"; and (2) not calling him before the jury means that the Defendant could not argue that Dr. Lee's failure to testify was because he took the Fifth. Id. There is no support for, or discussion of, these arguments in Seifert.

The arguments are also unavailing for other reasons. First, although having Dr. Lee invoke his Fifth Amendent privilege before the jury would have confirmed his existence, the government never disputed his existence, and another defense witness, Christopher Hudson, separately confirmed Dr. Lee's existence by testifying about his conversation with Dr. Lee. Also, as the government points out, "the physical presence of Lee asserting the Fifth Amendment would have provided no corroboration of the defendant's basis of knowledge regarding the trader." See Opp'n at 14. Moreover, the Court notes again that Defendant's own testimony was that he met with the trader on several occasions, thereby undermining any argument that "all his information regarding the trader" came from Dr. Lee. The Defendant provides no support for his argument that he was prevented from arguing that Dr. Lee's failure to testify was because Dr. Lee took the Fifth, see Mot. at 11, but even assuming

10

that was true, he is still left with the law of the Circuit that a non-party witness cannot be called solely for the purposes of taking the Fifth before a jury. See Seifert, 648 F.2d at 560.

Accordingly, the Court's failure to force Dr. Lee to invoke his Fifth Amendment rights before the jury does not warrant a new trial.

### C. Prohibiting Defendant from Cross-Examining the Financial Expert on the Basis of His Conclusions

Finally, Defendant argues that the Court erred by prohibiting him from cross-examining the government's financial expert,[6] W. Carson McLean, as to the factual basis of his testimony. Mot. at 13-15. But the Court did not prohibit such questioning. In fact the Defendant points to a single question he sought to ask about whether McLean "was informed that the case agent had obtained information from Billy Choi [the alleged trader] that defendant made cash payments to Mr. Choi to compensate him for his work trading the Ameritrade account." Id. at 13. The Court sustained an objection to that question, finding that it was based on hearsay. See Opp'n Ex. A (September 21, 2011 Trial Transcript) at 160.

Court-imposed limitations on cross-examination can violate the Confrontation Clause. See Howard v. Walker, 406 F.3d 114, 128 (2d Cir. 2005). And of course a defendant is entitled to cross-examine an expert witness as to the underlying facts or bases of his conclusions. See Fed. R. Evid. 702, 705. But "[a] limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witness." United States v. Urena, 659 F.3d 903, 907-08 (9th Cir. 2011). The limitation the Defendant points to does not nearly meet that standard.

During McLean's direct examination, the government introduced Government Exhibit 206, which showed that the Defendant was not investing the majority of investor funds, but instead using one investor's funds to pay another (a common hallmark of Ponzi schemes) and also converting some of the money for his own personal use. See Opp'n at 6, Ex. B. In cross-examining McLean as to Government Exhibit 206, the following exchange took place:

---

[6] McLean was, in fact, the only financial expert to testify; the Defendant did not call one.

| | | |
|---|---|---|
| Defense Counsel: | | Now, as to the $21,500 that went to Mr. Prince, did you attempt to determine whether that money was spent? |
| McLean: | | I did. |
| Defense Counsel: | | In the course of following that money, were you aware that the FBI located the trader who said that he was paid in cash? |
| AUSA Fazioli: | | Objection, your Honor. It's hearsay. |
| The Court: | | Sustained. |

Opp'n Ex. A (September 21, 2011 Trial Transcript) at 160.

A sidebar followed, in which the government argued that the question sought to introduce hearsay, exceeded the scope of the direct examination, and would open the door to the introduction of other statements made by Choi to the FBI. Opp'n at 6. The Court stated that it would not get into opening the door, and asked why the statement was not hearsay. Id. Ex. A at 161:19-20. The following exchange took place:

| | | |
|---|---|---|
| Defense Counsel: | | All I'm trying to do – I'm not trying to get in what was said other than for the point of view of whether he accounted for money that went to Prince to determine whether it was applied to a business expense such as paying the trader. |
| AUSA Fazioli: | | But the way it's getting in is you're saying, did they tell you this hearsay statement from the trader. |
| AUSA Danner: | | Can I make a suggestion, which is that – why don't you say, Dan: Do you know whether these went to personal expenses by Mr. Prince, or business expenses? And he's going to say no, he doesn't know. Isn't that getting the same thing which you are trying to show? He's not buying a fancy suit or something. |
| The Court: | | You can ask that. The answer is no, he doesn't know. |

Id. Ex. A at 162:10-25.

The Defendant then went on to ask a series of questions along the lines suggested by the government and approved by the Court:

12

| | | |
|---|---|---|
| Defense Counsel: | | Would it be fair to say that you don't know whether the money that was paid to Mr. Prince as indicated on Exhibit 206 went to his personal expenses or eventually went to business expenses for the Leopard Fund? |
| McLean: | | It did not go to Ameritrade. Some were personal expenses on the assumption of things being paid were for personal expenses. Some could have been expenses for something else. |
| Defense Counsel: | | Did you make any determination whether Mr. Prince paid some Leopard Fund business expenses in cash? |
| McLean: | | I saw cash withdrawals. I don't know what they were for. |
| Defense Counsel: | | Did you in your accounting identify any money that was explicitly identified as money that was being used to pay a trader? |
| McLean: | | I did not see any such payment. |

Id. Ex. A at 163:7-20.

Accordingly, the Court's ruling on the hearsay objection did not, as the Defendant asserts, see Mot. at 13, deny the Defendant the right to cross-examine McLean about the facts underlying his analysis; the Defendant asked a series of questions (and could have asked more) about just that. In addition, the Defendant was able to accomplish precisely what he "was trying to do," see Opp'n Ex. A at 162:10-14, that is, he showed that the government's financial expert did not account for whether any of the cash withdrawals that went to the Defendant were used to pay the trader or for other legitimate business expenses. The Defendant himself subsequently testified that he paid Choi in cash, and so the defense was in no way limited from arguing that the money identified in Government Exhibit 206 was all used to pay Choi. See Opp'n at 16.

All that the Defendant was not permitted to do was to use a double hearsay statement as the basis of his question, and thereby bootstrap inadmissable evidence into the trial. The Court's holding was correct under Federal Rules of Evidence 801 and 802, and the

13

1  Defendant does not really argue otherwise.  Barring a single question based on hearsay did
2  not deny the jury the information it needed to appraise McLean, nor did it limit the relevant
3  evidence or prejudice the Defendant.  See Urena, 659 F.3d at 907-08.
4      Accordingly, the ruling on McLean's testimony does not warrant a new trial.

**IV.  CONCLUSION**

For the foregoing reasons, the Court finds that none of the alleged errors identified by Defendant in fact constitute error, and that, for that reason, and because of the substantial evidence that came in at trial against the Defendant, it is not "reasonably likely that the outcome of the trial would have been different absent the alleged error[s]."  See Butler, 567 F.2d at 891.  The Motion is DENIED.

**IT IS SO ORDERED.**

Dated: December 13, 2011

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE