1  Daniel L. Barton, Esq., (SBN: 135806)

2  **Nolan, Armstrong**

3  **& Barton, LLP**

4  600 University Ave. \ Palo Alto, Ca. 94301
   Tel.  (650) 326-2980  Fax (650) 326-9704

5

6  Attorney for Defendant
   David Prince

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10              **SAN FRANCISCO DIVISION**

11

12  UNITED STATES OF AMERICA,              Case No. CR 10-00153 CRB

13                     Plaintiff,

14                                          **DEFENDANT'S SENTENCING**
                                            **MEMORANDUM**
15              v.

16  DAVID PRINCE,

17                     Defendant.          Date:   February 8, 2012
                                           Time:   2:15 p.m
18                                          Judge:  The Hon. Charles R. Breyer

19          Defendant David Prince, by and through his attorney Daniel L. Barton, hereby

20  submits this Sentencing Memorandum for the court's consideration in connection with Mr.

21  Prince's sentencing.  Defendant requests that the court impose a sentence not to exceed

22  24 months in federal prison.

23              **<u>INTRODUCTION</u>**

24          Defendant disagrees with the Sentencing Guidelines calculations set forth in the

25  Presentence Report [hereinafter referred to as "PSR"].  The PSR erroneously assesses

26  Mr. Prince with a two level upward adjustment for abusing a position of trust and a two

27  level upward adjustment for utilizing sophisticated means.  Additionally, the PSR

28  improperly denies Mr. Prince a two level downward adjustment for acceptance of

1   responsibility.  If Mr. Prince's Sentencing Guidelines were recalculated with these

2   adjustments made, his total offense level would be level 23, instead of level 29 as

3   calculated in the PSR.  If the guidelines were recalculated in this way, Mr. Prince, who

4   has a criminal history category of I, would fall into Zone D and have a guideline range of

5   46-57 months.

6        Further, Mr. Prince is entitled to a variance below the guidelines range based on

7   the nature and circumstances of the offense, as well as the history and characteristics of

8   the defendant.  18 U.S.C. § 3553(a)(1).  Specifically, Mr. Prince's convictions were likely

9   based on the reckless operation of a risky investment fund rather than an intentional and

10  premeditated scheme to defraud lenders/investors.  The history of the Leopard Fund

11  demonstrates that a concerted effort was made to trade the lender/investor funds in the

12  derivative market.  The goal of the Leopard Fund was to obtain a profit through trading

13  and to distribute the profits from those trades to the lenders/investors.  Funds were

14  actually traded, profits were generated, and interest payments were distributed to

15  lenders/investors.  The failure of the Leopard Fund was a result of Mr. Prince's flawed

16  business model and his unwarranted confidence in the skills of his trader.  Mr. Prince was

17  not excessively compensated by the Leopard Fund.  With the crash of the fund in the

18  spring of 2006, Mr. Prince lost substantial amounts of his own money and was deeper in

19  debt than when the enterprise started.

20       Additionally, Mr. Prince's criminal history is minimal and his prior convictions, all

21  misdemeanors, date back to the 1980's, mostly when Mr. Prince was 18 or 19 years old.

22  A prison term of no more than 24 months will more than adequately protect the public

23  and deter Mr. Prince from committing any future offenses.

24       Furthermore, a prison sentence greater than 24 months will substantially prevent

25  and delay Mr. Prince from paying off the substantial amount of restitution he will owe to

26  lenders/investors.  Mr. Prince has already begun to set aside funds for purposes of

27  paying restitution.  In January 2012, Mr. Prince received a disbursement from his father's

28  estate and deposited $60,000 in the trust account of defense counsel to be applied to the

1   payment of restitution.  On January 24, 2012, both the Probation Officer and Assistant

2   United States Attorney Joseph Fazioli were advised that these funds have been set aside

3   for that purpose.

4        Defendant also requests that the court permit him to voluntarily surrender to serve

5   any prison sentence imposed.  Mr. Prince has diligently appeared in court as required.

6   He has cooperated with pre-trial supervision and the preparation of the PSR.  He is not a

7   flight risk.  He has been gainfully employed while the case was pending.  He does not

8   present a danger to the community.  In all respects, Mr. Prince is an appropriate

9   candidate for voluntary surrender.

10                              **ARGUMENT**

11   **I.   SENTENCE UNDER THE GUIDELINES.**

12        In the PSR, Mr. Prince's total offense level was calculated at level 29.  This figure

13   was premised on a base level of 7, a 14 level upward adjustment based on a loss amount

14   greater than $400,000 and less than $1 million (2B1.1(b)(1)(H)),[1] a 2 level upward

15   adjustment for having 10 or more victims (2B1.1(b)(2)(A)), a 2 level upward adjustment

16   for violating the Texas Securities Board's Cease and Desist Order (2B1.1(b)(2)(B)(9)(C)),

17   a 2 level upward adjustment for utilizing sophisticated means (2B1.1(b)(2)(B)(10)(C)),

18   and a 2 level upward adjustment for abusing a position of trust as an attorney (3B1.3).

19   As noted above, Mr. Prince objects to this guidelines calculation.

20        For reasons set forth in detail below, Mr. Prince's total offense level is properly

21   calculated at level 23.  The base level of Mr. Prince's offense is level 7.  A 14 level

22   upward adjustment based on a loss amount greater than $400,000 and less than $1

23   million (2B1.1(b)(1)(H)) applies, as does a 2 level upward adjustment for violating the

24   Texas State Securities Boards' order (2B1.1(b)(2)(B)(9)(C)), and a 2 level upward

25

26   _____

     [1] The PSR erroneously states that the 14 level increase pursuant to USSG section 2B1.1(b)(1)(H) applies if
     the loss was more than $40,000, but less than $1,500,000.  The actual cut-off for the loss figure is
27   $1,000.000.  As the PSR assigns a loss figure of $822,647.82, this error does not alter the guidelines
     calculations set forth in the report.

28

                                    - 3 -

1  adjustment for having 10 or more victims (2B1.1(b)(2)(A)).  Mr. Prince should, however,

2  receive a two-level downward adjustment for acceptance of responsibility (3E1.1).  The

3  upward adjustments for utilizing sophisticated means (2B1.1(b)(2)(B)(10)(C)) and for

4  abusing a position of trust (3B1.3) are unwarranted.

5       If the guidelines are calculated as Mr. Prince contends, Mr. Prince, who has a

6  criminal history category of I, falls into Zone D and has a guideline range of 46-57

7  months.  While Sentencing Guidelines section 5C1.1(f) states that probation is not

8  authorized for a guideline range in Zone D, this provision of the Sentencing Guidelines in

9  no longer binding on the court. [2]  *United States v. Booker*, 543 U.S. 2203; *Gall v. United*

10 *States*, 552 U.S. 38; 169 L.Ed.2d 445; 128 S.Ct. 586 (2007); see also *United States v.*

11 *Anderson*, 365 F.Supp.2d 67 (D. Me. 2005); *United States v. Jones*, 352 F.Supp.2d 22

12 (D. Me. 2005) [the latter two cases both approve of Zone C flexibility for cases in Zone D

13 guidelines range].

### A.  The total amount lost is more than $400,000 and less than $1 million; therefore a 14 level increase pursuant to Sentencing Guidelines section 2B1.1(b)(1)(H) is appropriate.

16       Defendant agrees with the PSR that he should receive a 14 level upward

17 adjustment based on a loss of more than $400,000 but less than $1 million under USSG

18 section 2B1.1(b)(1)(H).  However, the defense disagrees with the inclusion of certain

19 individuals on the chart of alleged victims included in the PSR.  See PSR, pp. 5-6, ¶14.

20 Specifically, the defense submits that the following individuals should not be included in

21 calculating the total loss amount:

> a.   Gregory Burke should not be included in calculating the total loss amount.  Prior to the filing of criminal charges, defendant and Mr. Burke reached a civil settlement for funds owed by defendant to Mr. Burke.  Accordingly, Mr. Burke has been compensated for his loss.

---

26 [2] Defendant believes that he can serve the community and atone for his crimes through community service. As noted on pages 14-15, ¶¶ 53-54 of the PSR, Mr. Prince has been working with his friend and minister, Windie Chaleka, in organizing an HIV/AIDS testing project for children in Zimbabwe and South Africa.  Mr. Prince desires to continue working with Mr. Chaleka on this project.

b.      Michael Murphy should not be included in calculating the total loss amount.  Mr. Murphy was not a named victim.  He is not similarly situated with the named victims.  Mr. Murphy was recruited by Dr. Lee, and invested in the Dawnstar Alliance program.  Defendant is therefore not personally responsible for Mr. Murphy's loss, and the loss amount should not be considered for purposes of calculating the total loss under the Sentencing Guidelines or for awarding restitution.

c.      Martin Woodrow should not be included in calculating the total loss amount.  Mr. Woodrow was not a named victim.  He is not similarly situated with the named victims.  Mr. Woodrow was recruited by Dr. Lee, and invested in the Dawnstar Alliance program.  Defendant is therefore not personally responsible for Mr. Woodrow's loss, and the loss amount should not be considered for purposes of calculating the total loss under the Sentencing Guidelines or for awarding restitution.

For the reasons set forth above, the "Total Amount Invested" by individuals who suffered losses attributable to Mr. Prince is properly calculated as $944,640.  The "Total Monies Returned" is $230,992.18.  Based on the amendments proposed above, the "Total Loss" is $714,397.82.

Furthermore, for accuracy's sake, the chart in the PSR should also have included the dozens of individuals who invested in the Leopard Fund or MJE Invest! and who had their principal balances returned in full, generally with a significant profit.  Throughout the lifespan of the Leopard Fund and MJE Invest!, Mr. Prince endeavored to pay interest to the lenders/investors.  He also endeavored to use the funds entrusted to him, with the assistance of a trader who he believed was capable and experienced, in order to generate profits through derivative trading.  The inclusion of additional information about investors who did not lose their money would provide a more complete and accurate depiction of the operation of the Leopard Fund and of the losses and gains of lenders/investors in the program.

Mr. Prince agrees with the conclusion of the Presentence Report that a 14 level upward adjustment is warranted pursuant to USSG section 2B1.1(b)(1)(H).

///

///

1

2

    **B.**       **Mr. Prince did not utilize sophisticated means within the meaning of Sentencing Guidelines section 2B1.1(b)(2)(B)(10).**

3

      The PSR concludes that Mr. Prince utilized sophisticated means in the operation

4

of his fund because he "utilize[d] numerous bank and brokerage accounts to control the

5

funds that were received and disbursed during this offense."  "Sophisticated means"

6

under USSG section 2B1.1(b)(2)(B)(10), however, refers to "complex or especially

7

intricate conduct pertaining to the execution or concealment of an offense."  USSG

8

section 2B1.1, cmnt. n. 8(B).  The guidelines identify fictitious entities, corporate shells, or

9

offshore financial accounts as examples of sophisticated means.  *Id.*

10

      The use of multiple bank or brokerage accounts in this case does not constitute

11

more complex means than most business enterprises generally employ, and therefore an

12

upward adjustment pursuant to this section is unwarranted.  Ameritrade requires that its

13

accounts be linked to an account under the same name at a separate bank; thus, the use

14

of Ameritrade necessitated that multiple accounts be employed.  The first Ameritrade

15

account, which was held in Mr. Prince's own name, was a personal account.  The bank

16

account linked to the first Ameritrade account was also held in Mr. Prince's name.  The

17

second Ameritrade account was created for the purpose of placing all money in a trading

18

account under the proper name of the corporate entity operating the Leopard Fund,

19

Dawnstar Alliance, LLC.  In order to put the funds to trade, a bank account was created in

20

the name of Dawnstar Alliance, which linked to the Ameritrade account.

21

      Dawnstar Alliance, LLC was created using Mr. Prince's true name and the name of

22

his partner Dr. Lance Lee.  All money was eventually transferred from the David Prince

23

Ameritrade account to the Dawnstar Alliance Ameritrade account.  The transfer of funds

24

was accomplished in a completely transparent single transaction.   Thus, there was

25

nothing complex or intricate about the use of multiple accounts; it was simply a matter of

26

practical necessity given the trading platform employed.  Mr. Prince was not operating a

27

shell game, and he was not using multiple accounts to hide money.

28

1    Additionally, on page 4, ¶12, the PSR cites several other factors indicating

2    "sophisticated means," including that Mr. Prince "utilized a trader that lived outside of the

3    United States, established a bank account in another state, withheld financial documents

4    from investors, and claimed that returns were obtainable 'through an association with a

5    private trading group comprised of sophisticated and highly disciplined professionals who

6    have joined their respective skills and abilities in order to optimize key moments and

7    opportunities in the financial markets.'"

8    There was no trader who lived outside the United States.  As indicated through the

9    trial testimony of Lan Lin, Billy Choi (aka Billy Zhao) lived in Union City during the time of

10   the Fund's entire operation.  The other factors cited by probation also do not support an

11   upward adjustment.  The out-of-state bank account referenced was a New York Bank of

12   America account created by Matthew Ellsworth, who worked for Mr. Prince and resided in

13   New York.  During the time when the fund was operating as MJE Invest!, a separate MJE

14   Invest! bank account existed to accept payments and pay out interest and other

15   expenses.  Because Mr. Ellsworth resided in New York and handled many of the

16   transactions, the original MJE Invest! bank account was based in New York.

17   Additionally, if Mr. Prince falsely claimed that an elite private trading group was

18   doing the trading, the false statement may form the basis of the wire fraud charges, but it

19   does not warrant an upward adjustment for sophisticated means.  Finally, withholding

20   financial documents does not support an upward adjustment for sophisticated means

21   since it does not constitute "complex or especially intricate" conduct.

22   Thus, none of these factors supports an upward adjustment.  The sophisticated

23   means adjustment is not warranted and the guidelines calculation should be adjusted

24   accordingly.

25    **C.      Mr. Prince did not abuse a position of trust under Sentencing
            Guidelines section 3B1.3.**

26

27   The PSR concludes that "as an attorney, the defendant abused a position of trust

28   while involved in this scheme."  The upward departure on that basis is not warranted

- 7 -

**SENTENCING MEMORANDUM**

1   given the facts of the case.  Mr. Prince did not act as an attorney in relation to the

2   activities of the Leopard Fund; he acted only as the administrator of an investment

3   program.  He formed no attorney-client relationship with any lender/investor.  The two-

4   point adjustment pursuant to USSG section 3B1.3 for "abuse of position of trust" is

5   inapplicable because Mr. Prince's status as an attorney did not "substantially facilitate the

6   commission or concealment of the alleged fraud."  *United States v. Christiansen*, 958

7   F.2d 285, 288 (9th Cir. 1992).

8          "'Substantial' in this context has been interpreted to mean that, in addition to the

9   elements of the crime, the defendant exploited the trust relationship to facilitate the

10  offense." *Christiansen, supra*, 958 F.2d at 288 citing *United States v. Hill*, 915 F.2d 502,

11  505 (9th Cir.1990).  Mr. Prince acted as an administrator for The Leopard Fund; he did

12  not act as an attorney. The victims in this case are lenders/investors with whom Mr.

13  Prince did not have an attorney-client relationship.[3]  In fact, many of the

14  lenders/investors, such as Robert Perini, found the program via the internet and had no

15  personal contact at all with Mr. Prince.  Even for those individuals who spoke with Mr.

16  Prince and became aware of his status as an attorney, Mr. Prince's interactions never

17  extended beyond that of an ordinary commercial relationship, which is not subject to the

18  section 3B1.3 adjustment.  *United States v. Hayes*, 574 F.3d 460 (8th Cir. 2009); *United

19  States v. Moore*, 29 F.3d 175 (4th Cir. 1994).  Further, the mere fact that the defendant

20  truthfully listed his status as an attorney on the documents filed with the SEC does not

21  support the conclusion that he utilized his professional status as an attorney to facilitate

22  the offense.  See pages 4-5, ¶12 of PSR.

23         The conclusion that Mr. Prince abused a position of trust is unwarranted.  Mr.

24  Prince's status as an attorney did not substantially facilitate the commission of this

25

26  ─────────────────
    [3] On page 6, ¶ 10, the PSR states that "After the Cease and Desist order was made, the defendant
    continued to have BJW and SS as *clients*" (emph. added).  Defendant had no "clients" in the Leopard
27  Fund.  This statement erroneously implies that Mr. Prince developed an attorney-client relationship with
    these lenders/investors.  No such relationship existed.

28

offense within the meaning of USSG section 3B1.3, and the guidelines calculation should be adjusted accordingly.

### D. Mr. Prince is entitled to a two level downward departure under Sentencing Guidelines section 3E1.1 for acceptance of responsibility.

Under section 3E1.1 of the Federal Sentencing Guidelines, Mr. Prince is entitled to a two-point downward adjustment for acceptance of responsibility. A defendant will receive a two-level sentencing deduction if he demonstrates acceptance of responsibility for his offense.  This deduction can even apply to defendants who "proceed[] to put the government to its burden of proof at trial by denying the essential factual elements of guilt."  USSG section 3E1.1, cmnt. n. 2.  When a defendant does go to trial, however, "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct."  *Id.*  Mr. Prince qualifies for the downward departure for acceptance of responsibility because: (1) he fully admitted his role and involvement in MJE Invest! and the Leopard Fund prior to trial and again in his testimony at trial; and (2) his actions pre-trial confirm that he has accepted responsibility.

By proceeding to trial, Mr. Prince never denied his active and primary role in MJE Invest!, and the Leopard Fund.  In fact, Mr. Prince testified extensively regarding his involvement with these investment funds at trial.  He admitted that he made many of the statements alleged to be misrepresentations, though he testified that he honestly believed them to be true based on information provided to him by Dr. Lance Lee.  By having his matter heard by a jury, Mr. Prince provided a context and explanation for the actions he admitted.  Mr. Prince accepted responsibility for his actions and sought a jury determination whether his actions and misstatements nonetheless amounted to wire fraud under a standard of reckless indifference, which can serve as the requisite mental state to sustain a conviction of wire fraud.[4]

---

[4] The Court's Jury Instruction on recklessness read: "A person acts with reckless indifference if: (1) he or she is aware of a substantial and unjustifiable risk of a fact or circumstance in making a statement or

The Ninth Circuit's opinion in *United States v. Gamboa-Cardenas*, 508 F.3d 491 (9th Cir. 2007) is illustrative of situations in which a defendant may go to trial and still be entitled to a guidelines reduction for acceptance of responsibility.  In that case, the defendants were charged with violations of 46 App. United States Code section 1903.  To prove these violations, the prosecution was required to show that the defendants: (1) were on board a vessel subject to the jurisdiction of the United States, (2) knowingly possessed cocaine, and (3) possessed it with the intent to deliver it to another person. *United States v. Gamboa-Cardenas*, 508 F.3d 491, 505 (2007).

The defendants in *Gamboa-Cardenas* went to trial under the affirmative defense of duress, which required them to prove: (1) the existence of an immediate threat of death or serious bodily injury if they did not participate in the crime, (2) a well-grounded fear that the threat would be carried out, and (3) no reasonable opportunity to escape the harm.  *Id.*  The Ninth Circuit ruled that by relying on the defense of duress, they did not deny the essential factual elements of guilt.  *Id.*  Effectively, the defendants were admitting that they committed certain actions but were seeking to explain their mental states when committing those actions.  The acceptance of responsibility adjustment was further found to be appropriate because the defendants' pre-trial statements and conduct indicated acceptance of their involvement and were consistent with their testimony at trial.  *Id.* at p. 506.

Similarly, Mr. Prince affirmatively admitted that he made the statements and operated the funds that formed the basis of the Indictment.  Like the defendants in *Gamboa-Cardenas*, Mr. Prince went to trial to explain his mental state.  While the defendants in *Gamboa-Cardenas* stated they acted under duress, Mr. Prince testified he acted in good faith.  Accordingly, like the defendants in *Gamboa-Cardenas*, Mr. Prince

---

representation; and (2) he or she consciously disregards that risk in failing to discover the truth of a statement or representation."

**SENTENCING MEMORANDUM**

1  did not deny his involvement in the acts at issue in the case; in both cases, the

2  defendants were merely providing a context to explain why those acts were committed.

3      Mr. Prince's defense at trial was consistent with actions and statements made all

4  through pre-trial litigation.  In its Pretrial Conference Statement (Dkt. 59) filed on May 10,

5  2011, the defense acknowledged that Mr. Prince was involved in both forming and

6  running MJE Invest!, and the Leopard Fund.  In that document, the defense stated that

7  "[i]n approximately August 2005, David Prince, Matthew Ellsworth and Lance Lee worked

8  together to set up [companies] that accepted loans and paid interest on the loans

9  pursuant to a written contract. The companies invested funds in the options market."

10  Defendant's Pretrial Conference Statement: Statement of Facts and Motions in Limine

11  (Dkt. 59) at 1:23-27.  Later, in that same document, the defense stated "[t]he defendant

12  acknowledges participating in the companies [MJE Invest!, Leopard Fund, and Dawnstar

13  Alliance], accepting loans and paying interest."  *Id.* at 2: 8-9.

14      The defense also admitted its intended defense when it stated that "Mr. Prince will

15  defend the case on the grounds that all representations made to potential lenders were

16  either true or made in good faith."  Defendant's Pretrial Conference Statement: Statement

17  of Facts and Motions in Limine (Dkt. 59) at 2:22-23.  Thus, like the defendants in

18  *Gamboa-Cardenas*, Mr. Prince's testimony and defense at trial were consistent with each

19  of these statements made throughout pre-trial litigation.

20      Mr. Prince also admitted responsibility when he testified at trial.  Mr. Prince

21  acknowledged creating and operating MJE Invest! and the Leopard Fund.  He

22  acknowledged that he authored the loan agreements and was responsible for the content

23  of the websites.  Mr. Prince acknowledged speaking with lenders/investors and making

24  nearly every statement he was accused of making.  He testified extensively regarding his

25  lack of judgment in relying on the representations made by Dr. Lee regarding the trader's

26  track record and history.

27      During the first few months that MJE Invest! and the Leopard Fund were in

28  operation, Mr. Prince had no reason to doubt the representations made by Dr. Lee

because the trader initially performed quite well.  The impressive performance effectively corroborated the representations made by Dr. Lee about the ability and trading history of the trader.  Nonetheless, Mr. Prince did attempt to follow up with Dr. Lee regarding the traders' track record.  See Attachment A (E-mail from David Prince to Lance Lee Sent November 3, 2005.)[5]  Dr. Lee, however, would never provide him with the requested information.  Mr. Prince also admitted his mistake in ensuring the fund was SEC compliant.

> Q:   What was your first big mistake?
>
> A:   Probably my – a big mistake was not to get an adviser.  I need, really, some other experienced securities person.  I didn't know any securities attorneys at the time that I could have called, and didn't really have enough capital.
>
> So I winged it and did my own research and tried to put it together myself.

See 6 R.T. 1040:8-14, attached hereto as Attachment B.  He also admitted that he was not honest with lenders/investors when the Fund crashed.

> Q:   Once the Leopard Fund Trading Account crashed, did you disclose that promptly to all the lenders who deposited money with you?
>
> A:   No.
>
> Q:   Why not?
>
> A:   It was a really difficult moment.  I think I was in some definite shock, definite confusion, didn't really know how to handle it well, and failed to get advice, and I did not handle that well.

See 6 R.T. 1089: 15-23, attached hereto as Attachment C.  Accordingly, Mr. Prince never denied his management of the funds in pretrial litigation or when he testified at trial, and he repeatedly admitted his mistakes, misstatements, and lack of judgment.

The PSR does not recommend a downward adjustment for acceptance of responsibility; this conclusion primarily rests on the PSR's reliance on the court's

[5] This e-mail was admitted as Exhibit 341 at trial.

1    comments in denying defendant's Motion for a New Trial.  See PSR, pp. 6-8, ¶¶ 18-22.

2    The reliance on the court's ruling is misplaced.  In the Motion for a New Trial, Mr. Prince

3    alleged that the court erred in the treatment of Dr. Lee's unavailability due to the

4    assertion of his Fifth Amendment rights.  The quote from the court relied upon by the

5    PSR set forth the court's negative assessment of defendant's good faith defense

6    presented at trial.  The court explained that the purported errors, if they were errors at all,

7    were harmless, as there was sufficient evidence for a jury to find that defendant knew or

8    should have known that his statements to investors were not true.  Nonetheless, this

9    consideration is an entirely separate legal issue from whether defendant accepted

10   responsibility within the meaning of the Sentencing Guidelines.

11          Thus, even though Mr. Prince exercised his Constitutional right to go to trial, he

12   should be entitled to the acceptance of responsibility downward adjustment under the

13   Federal Sentencing Guidelines in light of his admission of his conduct at and before the

14   jury trial.

### E.    Conclusion to Guidelines Calculation

16          In view of the objections to the guidelines calculations set forth above, the total

17   offense level under the Sentencing Guidelines should be level 23.

### II.   A PRISON SENTENCE OF NO MORE THAN 24 MONTHS IS APPROPRIATE UNDER THE FACTORS OUTLINED IN 18 U.S.C. § 3553(a).

21          Under the factors listed in 18 U.S.C. section 3553(a), a sentence of no more than

22   24 months is appropriate in the instant case.  As the Supreme Court made clear in *Gall v.*

23   *United States*, while the Guidelines are the starting point in determining an appropriate

24   sentence, the judge should consider all relevant section 3553(a) factors.  *Gall, supra,* 169

25   L.Ed.2d 445, 457; 128 S.Ct. 586, 596 (2007).  "In doing so, [the district judge] may not

26   presume that the Guidelines range is reasonable.  He must make an individualized

27   assessment based on the facts presented."  *Ibid.* [internal citations omitted].   The court's

28   mandate is to "impose a sentence sufficient, but not greater than necessary, to comply

- 13 -

with the basic aim of sentencing." 18. U.S.C. § 3553(a).  In Mr. Prince's case, a sentence of no more than 24 months in federal prison would squarely fulfill those aims.

### A.   The Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1).

Under section 3553(a), a primary factor to be considered by the court in determining an appropriate sentence is the nature and circumstances of the offense. Significantly, when Mr. Prince created his investment fund, he did not intend to defraud the lenders/investors.  Mr. Prince fully believed and intended that the Leopard Fund would earn significant profits, both for himself and for others.  Mr. Prince's initial optimism was based largely on representations made by Dr. Lance Lee regarding the background and history of the fund's trader, Billy Choi (aka Billy Zhao).  Given Dr. Lee's status in the South Bay Christian Community and his academic and professional accomplishments, Mr. Prince took Dr. Lee's representations at face value.  Mr. Prince now understands and acknowledges that his reliance on Dr. Lee's representations was inadequate to protect those individuals who entrusted their money to Mr. Prince.

At the beginning of the Fund's operation, lenders/investors saw high returns on their investments.  In the first month of trading alone, lenders/investors received interest payments representing gains of 19.8% on their initial investment.  This large payout was justified by the impressive earnings generated by the trader in the derivatives market. With this notable initial performance, the trader amply demonstrated the expertise touted by Dr. Lee; Mr. Prince had no reason to doubt Dr. Lee's representations about the experience and abilities of the trader   The trader then went an entire month without conducting any trades, and MJE Invest! was unable to pay the lenders/investors the anticipated interest.  When trading resumed, however, the trader was able to achieve impressive gains over the next several months.  Even so, the trader's gains were not high enough to pay the 25% per month returns that Mr. Prince anticipated.  Mr. Prince terminated the 25% per month offering (known at that point in time as MJE Invest!) and established the Leopard Fund, with a more realistic interest payment of 5% interest per

1   month.  Mr. Prince notified the investors of the change and either refunded their principal

2   balances or allowed them to modify their loan/investment to The Leopard Fund.

3   　　　After making this adjustment, Mr. Prince's company continued to make monthly

4   interest payments to lenders/investors.  Mr. Prince still had no reason to doubt Dr. Lee's

5   representations because the trader continued to realize impressive returns. In March

6   2006, however, the trader incurred his first significant loss.  In one month, the fund

7   suffered a devastating loss of approximately $900,000.  Despite a considerable rebound

8   of approximately $300,000 in April 2006, the Leopard Fund never fully recovered.

9   Specifically, the trader suffered another loss of about $590,000 in May 2006 before the

10  Fund completely collapsed in July 2006.

11  　　　At all times during the lifespan of the Leopard Fund, Mr. Prince attempted to pay

12  lenders/investors the 5% monthly interest spelled out in the written agreement.  Mr.

13  Prince made interest payments to lenders/investors to the extent it was financially

14  possible to do so.  He continued to pay the interest payments even in the months when

15  the fund sustained enormous losses. After the May 2006 crash, however, the payments

16  became increasingly sporadic and ceased in July 2006.  Numerous lenders/investors

17  sought the return of their principal balances during this time.  The losses incurred left the

18  fund without the ability to return principal to the lenders/investors. The lack of interest

19  payments and the inability to return principal balances were not due to an attempt to

20  defraud individuals. The crippling losses incurred by the trader had left the Leopard Fund

21  unable to meet its obligations. There was simply not enough money left in the fund to

22  continue making interest payments or to return individuals' principal balances.

23  　　　Mr. Prince did not profit excessively from the operation of The Leopard Fund. To

24  the contrary, Mr. Prince invested all the money he had, along with the money he was able

25  to borrow from his credit cards, and lost.  Mr. Prince invested because he sincerely

26  believed in the ability of the magical trader to beat the market in a sustained manner over

27  time.  Similarly, the Leopard Fund investors lost their money not because Mr. Prince

28  appropriated it for his own personal use, but rather because they too believed that Mr.

1    Prince had found the secret formula to consistently generate abundant returns for

2    everyone.

3          Mr. Prince lost approximately $50,000 of his own money as a result of the Fund's

4    collapse.  Following the May 2006 loss, Mr. Prince did not lose faith that the fund could

5    rebound and that he would be able to begin to pay back the lost money. Mr. Prince drew

6    funds off his own personal credit cards and allowed the trader a final opportunity to prove

7    his abilities and resuscitate the fund.  Unfortunately, the trader failed again and the fund

8    suffered a near total loss.

9          The history of the Leopard Fund is defined by Mr. Prince's enduring and tenacious

10   optimism that the trader would ultimately succeed, however unreasonable that may have

11   been.  Mr. Prince failed to perform adequate due diligence regarding the background of

12   the trader and, instead, blindly relied on the representations of his close friend, advisor,

13   and business partner, Dr. Lee.  Mr. Prince accepted as an article of faith the

14   recommendations and assurances about the trader he had received from Dr. Lee.  The

15   fund was predicated on a strategy of making risky investments, and Mr. Prince failed to

16   appreciate or adequately plan for the losses that occurred.  He failed to plan for a

17   catastrophic loss because he believed in the infallibility of the trader.

18         The court instructed the jury that the intent to defraud could be established even if

19   the false statements were not made knowingly and were instead made in reckless

20   disregard of the truth.  See fn. 3 above for the jury instruction on recklessness.  While it is

21   not possible to know exactly how the jury reached its verdict, it is quite likely that Mr.

22   Prince was found guilty of wire fraud based on reckless indifference.

23         It is true that after the crash of the Leopard Fund investments, Mr. Prince was not

24   forthcoming with lenders/investors.  He did not reveal the collapse of the fund and instead

25   falsely led some investors to believe that the money was not all lost.  Mr. Prince's

26   behavior at the end, however, does little to shed light on Mr. Prince's intentions and

27   beliefs when the fund was established. Mr. Prince's concealment of the losses

28   demonstrates cowardice and continual blind optimism more than an intent to defraud.

Mr. Prince recognizes that he has a moral, personal and legal responsibility to make restitution to those who lost their money with the Leopard Fund. He paid back lenders/investors to the extent it was possible to do so.  To the best of his ability, Mr. Prince has settled with several investors.  He used his inheritance from his mother to settle the civil suit brought by Greg Burke and Sandra Covington.  Mr. Prince has set aside $60,000 for restitution, which he received in January 2012, from his father's estate.[6]

In light of the nature of the offense, a variance from the guidelines sentence is appropriate.

**B**.    **The History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1).**

A court should also consider the history and characteristics of the defendant in fashioning an appropriate sentence.  In the instant case, Mr. Prince's criminal record is minimal and largely more than thirty years old.

Defendant submits a brief social history in order permit the court to assess his offense in the context of his life history.  This account is based on interviews with Mr. Prince and his siblings, as well as a review of relevant documentation.  The social history attempts to communicate Mr. Prince's own understanding of how the defining events of his life have contributed to his failures in the operation of the Leopard Fund.

**1. Childhood and Adolescence**

David Prince was born in the Bay Area in 1962.  He was the youngest of four children to Dr. Edward Prince, a medical doctor, and Aileen Prince, a homemaker.  He was raised in Saratoga, California.  As described by his older sister Lisa Newman, "he was a charming, handsome boy who loved nature, adventure, pets of all kinds, sports, reading, and art."

---

[6] The funds are presently in the trust account of defense counsel and will be directed to the designated restitution account when it is opened.

**SENTENCING MEMORANDUM**

David Prince received little of his parents' attention growing up.  He was just 18 months younger than his brother, Roger, and the two boys were largely grouped together in their parents' minds.  When Roger needed to attend a special school for his dyslexia, for example, David was also placed in that school, even though David was not dyslexic and his brother's school would not meet David's needs.

When David Prince was 13, his father was offered a faculty position at the University of Washington Medical School, his alma mater.  Dr. Prince moved to Seattle, but the rest of the family stayed behind in Saratoga.  Eventually, David's parents divorced, and Aileen Prince had to go back to work to support the family.  Though David had never been close with his father, Dr. Prince was now almost completely out of David's life.  Even on the rare occasion when David would go up to Seattle to visit his father, Dr. Prince would never take any time off work, leaving David left to entertain himself alone in a city where he knew no one.

His parents' divorce constituted a huge turning point in David Prince's life.  As a child, David remembers craving his parents' attention, which he never received.  With his parents separated and his mother working, he received even less attention.  David did poorly in high school.  His grades continued to fall and by his junior year in high school, David received his GED and dropped out.  At this point, David had little direction in his life and was largely unmotivated.  He worked odd jobs to make money and occasionally got into trouble.

### 2. Young Adulthood

Around the time David Prince was 19, his older brother Mike Prince recognized the downward path that David was on.  Mike had joined the Covenant Church in Campbell and encouraged David to attend services with him.  Mike hoped that by attending church, David would find some direction in his life.

This, in fact, proved to be true.  When he was 19, David Prince began to attend classes at West Valley Community College in Saratoga.  David also began to immerse himself in his faith.  Each of David's siblings notes that the major turning point in David's

life was his Christian conversion.  According to his sister, David would read the Bible cover-to-cover many times.  He attended weekly services and became involved in the life of the church.

While his faith helped him to find some direction in his life, its effects on David Prince were not always positive.  Covenant Church was part of a nationwide movement in the 1980's referred to as "The Shepherding Movement."  The Movement was centered on a highly-disciplinary and overbearing religious structure where strict obedience was required by the church leadership.  While Covenant Church provided David with structure, it also exploited David's needs and insecurities to find mentors to guide him.  After all, David had spent much of his childhood searching for and trying to gain his father's attention.  Through Covenant Church, he readily found mentors willing to guide him.

Each member of the Covenant Church was assigned a "shepherd."  The "shepherd" operated as a mentor, and members were required to follow the demands laid out by their shepherds.  This religious requirement included going over to the shepherd's house on a regular basis to perform chores, such as yard work.  Additionally, members were not permitted to make major life decisions without first getting their shepherd's approval.  According to a 1975 New York Times article about the movement,

> "[t]he controversial teaching is known as discipling.  It holds that believers need to be grouped in units of about 10 under the direction a man (not a woman), or shepherd, who teaches and guides his disciples, or sheep, into Christina maturity….The disciples are expected to commit themselves to obey their shepherd, and are expected to give him tithes, or one tenth of their incomes."

"Growing Charismatic Movement is Facing Internal Discord over a Teaching Known as 'Discipling'," New York Times (September 16, 1975).  Thus, though the church's structure provided David with the guidance he craved, the structure of the church–and the demands it placed upon its members—allowed David to be exploited.

Nonetheless, throughout this time, David Prince became motivated to continue with his education.  After completing coursework at West Valley, he attended San Jose

State University, where he eventually received his Bachelor's degree in Business Administration in 1989.

Following his graduation from San Jose State, David began to recognize the exploitive nature of Covenant Church and sought a way to leave the church.   In this respect, David Prince was not alone.  Around this time, many members of the church began to leave, and the Shepherding Movement faced severe criticism nationwide. Unfortunately, because of the nature of Covenant Church, David Prince could not simply stop attending without facing considerable pressure from the church's members— including his own older brother.  When David Prince decided to attend law school, he opted to go out-of-state, a decision which would allow him to leave Covenant Church far behind.

David Prince ultimately decided to attend Regent University Law School in Virginia Beach, Virginia.  Regent was a newly-established, Christian faith-based law school.  It proved to be a good match for David, allowing him to further pursue his education in an environment where he could still grow in his faith.  According to David, going to law school was in fact a convenient cover to get away from the abusive structure of Covenant Church.

David Prince graduated from Regent in 1992.  According to David's brother Roger, "I often thought that David would not be able to complete the goals he kept setting for himself, but he kept proving me wrong…David became very focused and driven to achieve his goals."  In effect, David Prince's law school graduation marked the culmination of an impressive turn-a-round.  A man who had troubled teenage years and who dropped out of high school, a man who as a young adult had served jail time for auto theft and assault, now had a J.D. degree and was optimistic about his future.

**3. Legal Career and Adulthood**

Following his law school graduation, David Prince returned home to California.  It was not easy for him to establish his career as an attorney.  It took Mr. Prince three attempts before he eventually passed the California State Bar Exam.  His struggles in

**SENTENCING MEMORANDUM**

passing the bar and his degree from a little-known fledgling law school in Virgina made it impossible for David to find a job with an established law firm.  He began his legal career as a solo practitioner, "trusting that with hard work, he would become successful," according to his sister.

Mr. Prince worked hard, but struggled to establish a client base.  He had no legal experience.  He had not specialized in any specific practice areas.  As a brand new lawyer, Mr. Prince essentially took whatever case would walk through the door of his small Saratoga-based office.

Throughout his career as an attorney, Mr. Prince did achieve some successes.  Significantly, in 2008, he successfully helped a client, Gemma Dominno, retain custody of her children.  According to Ms. Dominno:

> "In the summer of 2008, I suffered the loss of my husband Eric following his suicide.  I suffered considerable stress and trauma following this event, and so my brother-in-law and his wife offered to temporarily care for my children.  As part of their temporary removal, I signed a consent to guardianship form.  I believed this form was necessary to remove my children from school and to acquire medical care for them.  I did not realize the complete ramifications of these documents.  I certainly never anticipated that formal legal proceedings would stem from them.
>
> Approximately two months after the guardianship was established, I personally challenged the legal sufficiency of it in court.  The court denied my request, and my in-laws retaliated by restricting me from seeing my children except through supervised visitation.  I was even required to pay for the third party supervisor during these visits.  At this point, I had a dire need for legal assistance in order to ensure that I could get my children back.
>
> I was put into contact with Mr. Prince by some friends.  He accepted my case and fought it through trial.  He filed numerous motions and documents on my behalf and represented me at several court proceedings.  Because of his representation, the court removed the guardianship order and allowed my children to return to my custody.
>
> Looking back, that was an extremely important moment in my life.  Mr. Prince's assistance meant a lot to me.  I did not understand what was going on throughout the entire process.  Given everything happening in my life, the situation had spun out of control.  Mr. Prince provided me the legal support and guidance that I needed during that stressful time.  He was supportive, kind, and was a strong advocate on my behalf.  I did not

have very much money at the time, and Mr. Prince was even understanding in working out a payment plan with me.  His advocacy meant the world to me, and he did an excellent job.  In getting to know Mr. Prince during the months that he worked on my case, I observed that he was a man with integrity and that he fought hard to help me win my case."[7]

Despite some successes in his legal work, Mr. Prince still sought alternate sources of income.  In 1997, for example, he decided to attend a weekend seminar about investing in options markets.  Following the seminar, he tried his hand at investing his own money, though he ultimately could not achieve consistent gains and lost his entire investment.

Mr. Prince met Dr. Lance Lee in the late-1990's when he went to the Christian Counseling Center to network in the Christian Evangelical community and advertise his law practice.  Dr. Lee was then working as a psychologist, and the two developed a professional relationship.  The two later ran into each other in 2005 after several years of not seeing each other.  Dr. Lee, then an associate pastor at Cathedral of Faith, a major South Bay church, told David about a trader with a tremendous track record of consistent returns.  Dr. Lee wanted to invest his own funds with the trader, and the two men considered collaborating to start an investment fund.  After several meetings during the summer of 2005, the two men established what would later be known as The Leopard Fund.

Dr. Lee was relatively wealthy, highly educated, and held a position of high social status in the Christian community. Mr. Prince never doubted the representations made by Dr. Lee. The fact that Dr. Lee wanted to put his own money in the fund gave David even greater confidence in Dr. Lee's adulation of the trader.   As Mr. Prince now recognizes: "The abusive structure of the church that I attended for many years undermined me and caused me to be frail to certain domineering personality types, particularly of a Christian influence.  Little did I know that I would be vulnerable to a predatory personality like

---

[7] Gemma Dominno submitted to probation a letter in support of David Prince.  As it is not referenced in the

**SENTENCING MEMORANDUM**

Lance Lee.  Like an ex-alcoholic who has been dry for a long time, falling off the wagon is never difficult.  Lance Lee fit all the elements that matched my weakness to failing under his influence.  He was highly-educated, had a high standing in the local Christian community, was a pastor at a large local church, [and] held the dominant role in our business we were forming. …I had known Lance for a significant number of years and already had a trust relationship with him professionally.  I was vulnerable to abuse of exactly this particular personality type."

Thus, though Mr. Prince's faith had saved him following his struggle in his teenage years, it made him vulnerable in other significant ways.  His sister further notes these exact characteristics of her brother: "He became a very trusting person who searched for mentors to guide him.  David also grew up to be a risk taker, who looked for increasingly unlikely opportunities to gain financial security and social status."

The opportunity to form The Leopard Fund thus represented a convergence of several of Mr. Prince's most significant struggles: his desire for increased wealth; his trust of those more professionally- and religiously-accomplished; and his risk-taking nature. These characteristics shed light on why the Leopard Fund ultimately failed—not because Mr. Prince attempted to defraud individuals, but because his operation of the fund was predicated on an unreasonable and enduring faith in the abilities of a trader he barely knew.  Mr. Prince's adherence to this belief was influenced by several long-existing character traits, which Mr. Prince—now five years after the crash of The Leopard Fund—finally recognizes.

Given Mr. Prince's character and history, including his otherwise lawful and productive life, a downward variance is warranted.

///

///

///

___

PSR, a copy of the letter is submitted as Attachment D.

**SENTENCING MEMORANDUM**

**C.**   **Deterrence Value of the Sentence and Protection of the Public from Future Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(B) and (C).**

Mr. Prince has a minimal criminal record.  As noted in the Presentence Report, Mr. Prince's last conviction occurred approximately 24 years ago.  Each of his three convictions was for a misdemeanor offense that resulted in a grant of probation. In the lengthy time since these convictions, Mr. Prince has otherwise lived a lawful and productive life.  Mr. Prince's age, education, employment history, absence of drug or alcohol use, and his status as a non-violent offender are all factors which indicate that a low probability of recidivism.  Measuring Recidivism: The Criminal History Computation of the Federal Sentence Guidelines (May 2004).

Mr. Prince ceased his involvement in The Leopard Fund and related investment programs by 2007.  He returned to the practice of law until he was indicted in March 2010, when his conditions of release prohibited him from maintaining a fiduciary relationship and effectively prohibited him from practicing law.

Since May 2010,[8] Mr. Prince has had consistent employment in directly selling deregulated energy to individuals and businesses.  Such work experience indicates that Mr. Prince has the ability to generate an income outside of the legal and investment world.  He recognizes that upon release from prison, he will need similarly stable employment to begin to pay back his restitution.

A prison sentence of no more than 24 months would be more than adequate to deter Mr. Prince from future involvement in fraudulent business dealings or other criminal activity.

**D.**   **The Need to Provide Restitution, 18 U.S.C. § 3553(a)(7).**

Mr. Prince will owe significant restitution to numerous lenders/investors as a result of this case.  Mr. Prince recognizes that he has a moral, legal and personal responsibility to work and pay back these lost funds.  Given that the restitution owed will likely be close

---

[8] On page 14, ¶ 65 of the PSR, it states that Mr. Prince has been employed in this capacity since May 2011.  This is incorrect; Mr. Prince has been employed since May 2010.

to $800,000, it will take Mr. Prince a substantial period of time to work and earn this money back.  The longer Mr. Prince's sentence, the longer it will take him to begin to make restitution.

Mr. Prince is serious about paying back his restitution.  He has already set aside for restitution $60,000, which he received as an inheritance from his father' estate. He previously used money from his inheritance from his mother's estate to settle claims with Greg Burke and Sandra Covington.  He will continue to work hard to pay back the reminder of his restitution.  Given this substantial debt, a prison sentence of no more than 24 months is appropriate in order to give Mr. Prince the possibility to pay back restitution as soon and as swiftly as possible.

### III.    OTHER SENTENCING ISSUES

In addition to the concerns outlined above, the defense makes the following requests and objections regarding the PSR:

1. On page 3, ¶6, defendant objects to the statement that about 60 investors invested a total of $1.2 million in The Leopard Fund.  This statement is misleading because it suggests that all of the lenders/investors in The Leopard Fund lost money, when in fact, many of them did not.

2. On page 3, ¶6, defendant objects to the report's reliance on an inaccurate definition of "guaranteed."  The report states that Mr. Prince made "representations to investors that their principal was 'guaranteed' but failed to take the necessary steps to guarantee those funds."  A "guaranteed" loan, however, is simply a loan where the recipient of the loan, or a third party, has promised to return the principal.  See Oxford English Dictionary (2nd Edition 1989).  The report implies a definition of "guaranteed" that is more consistent with the definition of "secured."  A "secured loan" is "[a] loan for which some form of property has been pledged or mortgaged."  Black's Law Dictionary (5th Edition 1979).  "Guaranteed" and "secured" have distinct legal meanings; the terms cannot be used interchangeably. Defendant never told lenders/investors that their investments were "secured."

3. On page 3, ¶7, defendant objects to the statement that "the defendant transferred a net total of over $60,000 to a foreign bank account in China (as commission to Billy Zhao, the trader involved in this scheme)."  The actual payments to the trader were far greater than the one $60,000 bank transfer in February 2006.  The trader was paid commissions on all trades that produced a profit.  In fact, many of the cash withdrawals, which the government has previously contended were payments to David Prince, were made to obtain funds to pay the trader his commission.

4. On page 3, ¶7, defendant objects to the statement, "Towards the end of the scheme, some of the $1.2 million was returned to the investors in the form of 'interest' payments instead of being invested."  The interest payments did not start towards the end of the scheme.  At all times since the beginning of MJE Invest! and The Leopard Fund, defendant paid interest payments to those who loaned/invested money to his business.  Furthermore, defendant objects to the use of quotation marks around "interest."  The "interest" payments were, in fact, interest payments.  The Leopard Fund held the monies of lenders/investors and was contractually obligated to pay interest on these funds.  Defendant at all times made his best effort to pay the interest payments to lenders/investors as provided in the Loan Agreements.

5. On page 6, ¶9, defendant objects to the statement that "[f]unds were solicited from victims BJW and SS, both residents of Texas, during this timer period and subsequently traded."  This is incorrect.  While funds may have been solicited, neither BJW nor SS loaned/invested any money after the issuance of the Cease and Desist Order.  Accordingly, funds from them could not have been subsequently traded.

6. On page 14, ¶65, the court should take note that Mr. Prince began his current employment in May, 2010, not May, 2011.

7. On page 15-16, ¶68, the PSR states "Auto Loan (Auto Reported Stolen)" equaled $60,000 of an unsecured debt.  The court should note that Mr. Prince's car was stolen in November 2011.  On January 2, 2011, the car was found, and Mr. Prince paid about $475 to retrieve the car from an impound lot.  The car's engine had been destroyed, parts had been removed, a speaker had been installed, and the car smelled like marijuana.  A gram scale was found in the car.  The total amount of damage to the car has been estimated at $6,000-$8,000.

## IV.   MR. PRINCE IS A GOOD CANDIDATE FOR VOLUNTARY SURRENDER.

The PSR's Sentencing Recommendation states that "[t]he defendant is viewed as a good candidate for voluntary surrender."  The defendant agrees with this statement and would urge the court to allow him to voluntarily surrender to start his sentence. Mr. Prince has diligently appeared in court as required.  He has cooperated with pre-trial supervision and the preparation of the Presentence Report.  He is not a flight risk.  He has been gainfully employed while the case was pending.  He does not present a danger to the community.  In all respects, Mr. Prince is an appropriate candidate for voluntary surrender.

1
2

## <u>CONCLUSION</u>

3

For the reasons stated above, Mr. Prince's total offense level is properly calculated

4

at level 23.  A downward variance is warranted under the factors listed in 18 U.S.C.

5

section 3553.  Mr. Prince respectfully requests that this court impose a sentence of no

6

more than 24 months.  Mr. Prince also requests the opportunity to self-surrender.

7

Respectfully submitted,

8

NOLAN, ARMSTRONG & BARTON LLP

9

/s/

10

Dated: January 31, 2012

11

_____
Daniel L. Barton
Attorney for Defendant David Prince

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SENTENCING MEMORANDUM**